UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ROBERT J. KILLION, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | 04-40256-FDS |
| | ) | |
| COMMONWEALTH YACHTS and MAINSHIP CORPORATION, | ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER ON MOTION TO
DISMISS OF DEFENDANT COMMONWEALTH YACHTS**

**SAYLOR, J.**

This action arises out of the purchase by Robert J. Killion, Jr., of an allegedly defective Mainship 390 Trawler from Commonwealth Yachts, Inc., of Gloucester Point, Virginia. Commonwealth Yachts has moved to dismiss Killion's claim under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction. For the reasons set forth below, defendant's motion will be granted.

**I.   Background**

The relevant facts derived from the pleadings and affidavits are as follows. Killion is a resident of Princeton, Massachusetts. In October 2001, Killion attended a boat show in Annapolis, Maryland. Both Commonwealth Yachts, a yacht broker incorporated in Virginia with a principal place of business in Virginia, and Mainship, a power-boat manufacturer incorporated in New Jersey, were exhibitors at the show.

While at the Annapolis Boat Show, Killion began discussing certain characteristics of the 2002 Mainship 390 Trawler with representatives of Mainship and Commonwealth. Killion asked

a number of specific questions, including whether the vessel was made of solid fiberglass below the waterline and whether certain swim-platform leakage problems, present in some of the earlier model 350 and 390 Trawlers, had been solved.  According to the complaint, "the representative of Mainship and Commonwealth answered both in the affirmative."  On the basis of that representation, Killion decided to purchase a model 390 Trawler.

According to Killion, negotiations related to the sale of the vessel commenced at the Annapolis Boat Show, but the sale was not consummated at that time.  Instead, Killion contends, he received "numerous" telephone calls from Bill Berger, a representative of Commonwealth, once he returned to Massachusetts and engaged in "extensive negotiations" with Berger before he agreed to the sale.  Each time, Killion maintains, he was contacted in Massachusetts.

Commonwealth contends, however, Killion selected the boat model and its options, and that the parties negotiated the purchase price and all material terms of the contract, at the boat show in Maryland.  According to Commonwealth, Killion asked whether he could take delivery of the vessel in Massachusetts and if Commonwealth would set up a place of business in Massachusetts; Commonwealth refused both requests.  Commonwealth maintains that, after Killion returned to Massachusetts, there were "perhaps two" telephone calls between Killion and Commonwealth.

In any event, Commonwealth faxed a purchase agreement to Killion in Massachusetts for his signature on October 16, 2004.  Killion signed it and faxed it back to Commonwealth.  Killion paid for the trawler with funds he forwarded from his Massachusetts bank account.  He then took possession of the vessel at Commonwealth's facility in Gloucester Point, Virginia.

Soon after acquiring the trawler, Killion began to observe problems with it, including a

noticeable list and a loss of approximately three to four knots of top-end speed.  Upon further investigation, Killion learned that the swim platform of the trawler had filled up with seawater, the added weight of which apparently caused the list and speed loss.  Killion took the vessel to DeMillo's Marine in Maine for repairs, where he learned that the swim platform was in fact cored and not made of solid fiberglass.  In addition, the cored areas of the swim platform had become permeated with seawater, wetting the balsa-wood core.  According to Killion, if he had been aware that the vessel was not solid below the waterline or that the swim-platform leakage issues remained present in the 2002 Mainship 390 Trawler, he would not have purchased the vessel.

Apart from the transaction described above, Commonwealth has not marketed or sold any boat or other product in Massachusetts.  The company's president, Harry Barritt, has not been to Massachusetts for approximately 15 years, and he cannot recall a Commonwealth employee ever traveling to Massachusetts to conduct business for the company.

Killion commenced this action in Worcester Superior Court by filing a complaint on October 5, 2004.  Mainship answered the complaint in state court and then removed the case to this Court on December 13, 2004, on the basis of diversity jurisdiction.  On January 19, 2005, Commonwealth filed the present motion to dismiss for lack of personal jurisdiction.  On February 11, 2005, Killion filed an amended complaint, which Mainship answered on March 14, 2005.[1]

## II.    Legal Analysis

Commonwealth asserts that the Massachusetts long-arm statute does not provide a basis

---

[1] Mainship subsequently filed a motion (1) to dismiss for lack of personal jurisdiction and improper venue, (2) to transfer the case to the Eastern District of Virginia, or (3) to dismiss under the doctrine of *forum non conveniens*.  Because the issues involved in Mainship's motion are different from those presented here, that motion will be treated separately.

for the exercise of personal jurisdiction over it in this forum. Killion counters that personal jurisdiction over Commonwealth exists because this case arises out of Commonwealth's (1) transacting business in Massachusetts; (2) contracting to supply things in Massachusetts; (3) causing tortious injury by an act or omission in Massachusetts; or (4) causing tortious injury in Massachusetts by an act or omission outside Massachusetts. *See* Mass. Gen. Laws ch. 223A, § 3(*a*)-(*d*). The question is whether the interactions between Killion and Commonwealth satisfy the requirements of any of the cited sections of the long-arm statute.

### A.     The Standards for Personal Jurisdiction

"To hear a case, this Court must have personal jurisdiction over the parties, 'that is, the power to require the parties to obey its decrees.'" *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 50 (1st Cir. 2002) (quoting *United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 35 (1st Cir. 1999)). "A district court, faced with a motion to dismiss for lack of personal jurisdiction, Fed. R. Civ. P. 12(b)(2), 'may choose from among several methods for determining whether plaintiff has met [its] burden' of proving the court's personal jurisdiction over the defendant." *Northern Laminate Sales, Inc. v. Davis*, 403 F.3d 14, 22 (1st Cir. 2005) (quoting *Daynard*, 290 F.3d at 50-51). The prima-facie method is the most common of these methods. *Id.* It "permits the district court 'to consider only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction.'" *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 145 (1st Cir. 1995) (quoting *Boit v. Gar-Tec Products, Inc.* 967 F.2d 671, 675 (1st Cir. 1992)). The prima-facie method is appropriate here because the jurisdictional ruling does not involve materially conflicting versions of the relevant facts. *See id.* at 145-46 (describing the preponderance-of-the-

evidence and likelihood standards).

Under the prima-facie standard, the Court "must accept the plaintiff's (properly documented) evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing." *Id.* The plaintiff

> must do more than simply surmise the existence of a favorable factual scenario; he must verify the facts alleged through materials of evidentiary quality. Thus, allegations in a lawyer's brief or legal memorandum are insufficient, even under the relatively relaxed prima facie standard, to establish jurisdictional facts.

*Barrett v. Lombardi*, 239 F.3d 23, 27 (1st Cir. 2001). And the Court is not required "to credit conclusory allegations or draw farfetched inferences." *Massachusetts Sch. of Law v. American Bar Ass'n,* 142 F.3d 26, 34 (1st Cir. 1998) (quoting *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 203 (1st Cir. 1994)). Following the plaintiff's proffer, the Court may consider uncontradicted facts put forward by the defendant. *Id.*

The Court's personal jurisdiction over a defendant may derive from either general or specific jurisdiction. *Id.* "General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." *Id.* The facts of this case do not support a finding of general jurisdiction, and Killion does not argue otherwise.

"In the absence of general jurisdiction, a court's power depends upon the existence of specific jurisdiction. Specific jurisdiction exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities, such as when the litigation itself is founded directly on those activities." *Id.* Here, Killion asserts specific jurisdiction under the Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, § 3. He cites four subsections of the

5

statute as potentially applicable to this case:  § 3(*a*), which applies to any person "transacting business in" Massachusetts; § 3(*b*), which applies to any person "contracting to supply services or things in" Massachusetts; § 3(*c*), which applies to any person "causing tortious injury by an act or omission in" Massachusetts; and § 3(*d*), which applies to any person "causing tortious injury in [Massachusetts] by an act or omission outside [Massachusetts] if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in [Massachusetts]."  The Court will consider the applicability of each subsection in turn.

**B.     Whether Commonwealth Transacted Business in Massachusetts—§ 3(*a*)**

For jurisdiction to exist under § 3(*a*), the defendant must have transacted business in Massachusetts, and the plaintiff's claim must have arisen from the transaction of business by the defendant.  *Intech, Inc. v. Triple "C" Marine Salvage, Inc.*, 444 Mass. 122, 126 (2005).  The Court concludes that Killion has not satisfied his burden of demonstrating that Commonwealth transacted business in Massachusetts.

Killion's evidentiary proffer, viewed in the light most favorable to him, is as follows. Killion traveled to Annapolis, Maryland, in October 2001 to attend a boat show.  While there, he met with representatives of Commonwealth and had some preliminary discussions about purchasing a 2002 Mainship 390 Trawler.  Upon his return to Massachusetts, Killion received "numerous" telephone calls from Bill Berger of Commonwealth—more than the "perhaps two" claimed by Commonwealth—and engaged in "extensive negotiations" with Berger before he agreed to enter into the transaction.  Commonwealth faxed the purchase agreement to Killion in Massachusetts for his signature.  Killion forwarded payment for the vessel from his Massachusetts

bank account, but took possession of the vessel in Virginia.

As a preliminary matter, Killion's contentions regarding the number of phone calls he received from Commonwealth and the extent of the negotiations he had with Commonwealth by telephone from Massachusetts strike the Court as potentially overstated. *See Massachusetts Sch. of Law,* 142 F.3d at 34. In fact, by Killion's own admission, the Annapolis Boat Show was held on October 12-14, 2001, and Commonwealth faxed the purchase agreement to Killion for his signature on October 16, 2001. That leaves at most four days during which these "numerous" telephone calls and "extensive" negotiations are claimed to have occurred.

Nevertheless, taking Killion's proffer at face value, the activities described above are insufficient to constitute the transaction of business in Massachusetts under the long-arm statute. In fact, this case is very similar to two decisions by the Supreme Judicial Court that, like this case, involved the purchases of boats or marine equipment.

In *Droukas v. Divers Training Academy*, 375 Mass. 149, 151 (1978), the plaintiff saw the non-resident defendant's advertisement for the sale of two marine engines in *Boats and Harbors* magazine, which was distributed in Massachusetts. The plaintiff, in Massachusetts, telephoned the defendant's place of business in Florida, spoke with its president, and ordered the engines. *Id.* Plaintiff then forwarded a check for the purchase price to the defendant. *Id.* The defendant's president sent a letter to the plaintiff in Massachusetts confirming the sale, as well as several other letters concerning the sale. *Id.* Subsequently, the defendant shipped the engines from Florida to Massachusetts. *Id.*

The SJC held that those contacts were insufficient to constitute "transacting of business" in Massachusetts within the meaning of § 3(*a*). *Id.* at 153. Characterizing the defendant's activity

as "an isolated transaction, with slight effect on the commerce of the Commonwealth and . . . void of any purposeful intent on the part of the defendant to avail itself of the privilege of conducting activities within [Massachusetts]," the court affirmed the decision of the Superior Court granting the defendant's motion to dismiss for lack of personal jurisdiction. *Id.* at 150, 154.

In *Intech*, the president of the plaintiff corporation saw the non-resident defendant's advertisement in *Boats and Harbors* magazine for the sale of a watercraft and hired an agent to negotiate its purchase. 444 Mass. at 123. The agent made contact with the defendant by telephone and agreed to purchase the vessel for $16,000. *Id.* Subsequently, the defendant faxed an invoice and, upon receiving payment, sent the plaintiff a bill of sale. *Id.* The plaintiff paid for shipping costs, and, after accepting delivery of the vessel outside Massachusetts, the agent telephoned the defendant in Louisiana indicating that he was satisfied with it. *Id.* The agent also told the defendant that the plaintiff was interested in acquiring another similar watercraft; the defendant agreed to help. *Id.*

Several weeks later, the defendant, in Louisiana, telephoned the agent in Massachusetts and informed him that he had found another watercraft in Florida. *Id.* Approximately thirty minutes after that call, the agent telephoned the defendant, and they agreed on a purchase price of $16,000. *Id.* Shortly thereafter, the agent telephoned the defendant in Louisiana and asked to speak with the vehicle's owner directly. *Id.* The next day, the defendant provided the agent with the owner's telephone number, an invoice for the vessel, and an estimate from a shipping vendor. *Id.* The agent sent the defendant a check as payment. *Id.* at 123-24. After depositing the check, the defendant forwarded the agent a bill of sale. *Id.* at 124. The agent took possession of the vessel in Florida. *Id.* He later telephoned the defendant in Florida to express dissatisfaction with

the condition of the second vessel. *Id.*

As in *Droukas*, The SJC held that those activities did not constitute "transacting of business" in Massachusetts within the meaning of § 3(*a*). *Id.* at 126. The court stated that the facts—other than the "exploratory" telephone call from the defendant concerning the possible purchase of a second vessel—were "essentially indistinguishable" from those of *Droukas*. *Id.* at 127. The fact that the defendant had agreed to help the plaintiff find a second vessel and had initiated contact with the plaintiff regarding that subject did not amount to "'a regular course of dealing' and 'continuing relationship' between the parties." *Id.* Rather, the court concluded, the two sales were "isolated transactions" that did not support the exercise of personal jurisdiction. *Id.*

Here, the facts supporting jurisdiction are weaker even than those in *Droukas* and *Intech*. In both of those cases, the plaintiff became interested in purchasing the relevant product because of advertisements placed by the defendant in a magazine disseminated in Massachusetts. *Intech*, 444 Mass. at 123; *Droukas*, 375 Mass. at 151. Here, in contrast, Killion traveled to Annapolis, Maryland, where he initiated contact with Commonwealth. In *Intech* and *Droukas*, all negotiations and steps leading to the sales occurred while the plaintiff was in Massachusetts and the non-resident defendant was in a different state. *Intech*, 444 Mass. at 123-24; *Droukas*, 375 Mass. at 151. Here, it is undisputed that at least some portion of the negotiations leading up to Killion's purchase of the Mainship 390 Trawler took place in Maryland. Finally, in *Droukas*, the defendant shipped the product to the plaintiff in Massachusetts. 375 Mass. at 151. It is undisputed in this case that Killion accepted delivery of the trawler in Virginia.

Accordingly, the Court concludes that the telephone calls from Commonwealth to Killion

9

in Massachusetts, in whatever quantity and for whatever purpose, combined with the faxing of the purchase agreement to Massachusetts and the receipt of payment from Killion's Massachusetts bank account, are insufficient contacts under *Droukas* and *Intech* to constitute the transaction of business in Massachusetts within the meaning of § 3(*a*). *See Intech*, 444 Mass. at 126; *Droukas*, 375 Mass. at 153. Instead, Commonwealth's sale of the trawler to Killion must be seen as an isolated transaction "having 'slight effect on the commerce of the Commonwealth and . . . void of any purposeful intent on the part of [Commonwealth] to avail itself of the privilege of conducting activities within [Massachusetts].'" *Intech*, 444 Mass. at 127 (quoting *Droukas*, 375 Mass. at 154).

### C.   Whether Commonwealth Supplied Things in Massachusetts—§ 3(*b*)

For jurisdiction to exist under § 3(*b*), the defendant must have supplied "things" in Massachusetts. Section 3(*b*) does not apply when the plaintiff receives an item in another state and is responsible for its return to Massachusetts. *Intech*, 44 Mass. at 125. It is undisputed that Killion accepted delivery of the trawler in Virginia. Therefore, there is no basis upon which to exercise jurisdiction over Commonwealth under § 3(*b*).

### D.   Whether Commonwealth Caused Tortious Injury by an Act or Omission in Massachusetts—§ 3(*c*)

For jurisdiction to exist under § 3(*c*), the defendant must have caused tortious injury by an act or omission in Massachusetts. Here, the only claimed tortious injury relates to the alleged misrepresentations made by representatives of Commonwealth concerning whether the vessel was made of solid fiberglass below the waterline and whether certain swim-platform leakage problems, present in some of the earlier Mainship 350 and 390 Trawlers, had been solved. There is no

evidence, however, that any of the alleged misrepresentations were made to Killion in Massachusetts by telephone. The only statements to that effect are contained in Killion's memorandum of law in opposition to Commonwealth's motion to dismiss. However, "allegations in a lawyer's brief or legal memorandum are insufficient, even under the relatively relaxed prima facie standard, to establish jurisdictional facts." *Barrett*, 239 F.3d at 27. Killion makes no such statements in his affidavits, and in any event the complaint clearly alleges that the alleged misrepresentations were made to him in Maryland. Accordingly, the Court finds that there is no evidentiary basis on which to find jurisdiction under § 3(*c*).

### E. Whether Commonwealth Caused Tortious Injury by an Act or Omission Outside Massachusetts—§ 3(*d*)

Finally, for jurisdiction to exist under § 3(*d*), the defendant must have caused tortious injury in Massachusetts "by an act or omission outside [Massachusetts] if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in [Massachusetts]." Here, the undisputed facts show that Commonwealth is a Virginia-based dealership that does not regularly do business or solicit business in Massachusetts or engage in any other course of conduct that would bring it within the scope of § 3(*d*). Apart from the transaction involving Killion, Commonwealth has not marketed or sold any boat or other product in Massachusetts. Commonwealth's president, Harry Barritt, has not been to Massachusetts for approximately 15 years, and he cannot recall a Commonwealth employee ever traveling to Massachusetts to conduct business for the company. Accordingly, there is no basis upon which to exercise jurisdiction over Commonwealth under § 3(*d*).

**B.**     **Conclusion**

For the reasons set forth above, the Court concludes that the Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A § 3, does not provide a basis upon which this Court can exercise personal jurisdiction over the defendant Commonwealth Yachts, Inc. Defendant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) is therefore GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: August 25, 2005