UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ROBERT J. KILLION, JR., <br><br> Plaintiff, <br><br> v. <br><br> COMMONWEALTH YACHTS and MAINSHIP CORPORATION, <br><br> Defendants. | Civil Action No. <br> 04-40256-FDS |

**MEMORANDUM AND ORDER ON MOTION TO
DISMISS OF DEFENDANT MAINSHIP CORPORATION**

**SAYLOR, J.**

This action arises out of the purchase by Robert J. Killion, Jr., of an allegedly defective boat manufactured by Mainship Corporation. Killion purchased the boat, a Mainship 390 Trawler, from Commonwealth Yachts, Inc., after meeting with representatives of both Commonwealth and Mainship at a boat show in Annapolis, Maryland.

Both Mainship and Commonwealth moved to dismiss the case on grounds of lack of personal jurisdiction. Because Mainship's motion involved additional factual allegations, the Court treated the motions separately. On August 25, 2005, it granted Commonwealth's motion to dismiss for lack of personal jurisdiction. For the reasons set forth below, Mainship's motion will also be granted.

I.     **Factual Background**

The following is a recitation of the facts submitted and properly supported by the plaintiff, with certain additional facts proffered by defendant that are not genuinely contested. *See Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998).[1]

Killion is a resident of Princeton, Massachusetts. Mainship is a manufacturer of power boats; it is incorporated in New Jersey and has places of business in both Florida and Georgia. Commonwealth is a yacht broker and a dealer of Mainship trawlers; it is incorporated, and has a principal place of business, in Virginia.

Killion attended a boat show in Annapolis, Maryland, in October 2001. Commonwealth was an exhibitor at the boat show. A representative of Mainship was also present. The show ran from October 14 until October 16.

While at the boat show, Killion met with representatives of Commonwealth and Mainship and discussed with them the features of a 2002 model Mainship Trawler.[2] At some point, he

---

[1] As is discussed more fully below, the plaintiff bears the burden to set forth affirmative proof of the jurisdictional facts that establish personal jurisdiction. Plaintiff's evidentiary proffer is thin at best. His declarations neglect to set forth several of the jurisdictional facts contained in his complaint. "It has long been the rule of this circuit . . . that plaintiffs may not rely on unsupported allegations in their pleadings to make a *prima facie* showing of personal jurisdiction." *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992) (refusing to consider plaintiff's unsupported allegations, even where the defendant did not present evidence to refute them; to have done so would have impermissibly placed the burden on defendant to prove the absence of personal jurisdiction). Plaintiff's complaint is not verified and the Court will not consider the facts as stated therein.

[2] According to the complaint, Killion asked specific questions about the 2002 Mainship 390 Trawler, including whether it was made of solid fiberglass below the waterline and whether certain swim platform leakage problems, present in some of the earlier model Mainship 390 and 350 Trawlers, had been solved. In response to these direct questions, "the representative of Mainship and Commonwealth answered both in the affirmative." Killion's complaint also states that he had been researching his purchase options for approximately two years before the boat show, and that in reliance on these representations, Killion decided to purchase the vessel. These facts are not properly supported and the Court will not consider them for the purposes of this motion.

began negotiating the purchase of the vessel; Killion described his negotiations with Bill Berger, a representative of Commonwealth, as "extensive." Although these negotiations commenced at the show, the sale was not consummated at that time. Killion states that, once he returned to Massachusetts, he received "numerous" telephone calls at his home or business from Berger. He also received at least two faxes, including two contracts (one pertaining to a vessel with guardrails, the other without) and a Purchase Agreement.[3] The Purchase Agreement indicates that it was faxed on October 16, 2001. Killion countersigned the Purchase Agreement and faxed it back to Commonwealth.[4]

The vessel was manufactured by Mainship in 2001 and 2002 in Florida. Killion took possession of it at Commonwealth's facility in Gloucester Point, Virginia. According to Killion, he picked up the vessel in Virginia because Commonwealth informed him that if he were to take delivery in Massachusetts, "they would be infringing on other sellers in the area."

According to Commonwealth's president, Harry Barritt, Commonwealth has never marketed nor sold any boat or other product in Massachusetts, nor has it ever sent any employees to Massachusetts.

According to Michael Hankins, Director of Customer Relations for Mainship and Luhrs Corporation (Mainship's parent company), Mainship has no authorized dealerships in

---

[3] Killion's February 3 affidavit purports to include a facsimile dated October 16, 2001 as Exhibit A. However, no such exhibit was filed with the Court. The Court assumes that the fax to which Killion refers is the same October 16, 2001 facsimile attached to Barritt's affidavit as Exhibit A.

[4] Commonwealth contends that Killion selected the boat model and its options and that the parties negotiated the purchase price and all material terms of the contract at the boat show. According to Commonwealth, it refused Killion's request to take delivery of the vessel in Massachusetts and that Commonwealth set up a place of business in Massachusetts. Killion submitted evidence disputing the truth of these contentions. Accordingly, they do not factor in the Court's resolution of the motion.

Massachusetts and is not registered to do business in the state. Hankins also stated that Mainship authorized a repair of the swim platform of Killion's vessel; the work was performed at DiMillo's Old Port Marina Yacht Sales in Maine.

Killion submitted an affidavit, dated June 15, 2005, attesting that (1) on September 28, 1999, he received a fax from Mainship containing information about Mainship's trawler;[5] (2) that Scituate Yachts, located in Massachusetts, was an authorized Mainship dealer in 1998 and was such a dealer for approximately three years; (3) that Russo Marine, which is located in Massachusetts, became an authorized Mainship dealer after Scituate and was such a dealer in 2001 when it had a new Mainship vessel for sale;[6] (4) that in the fall of 2000, Russo Marine gave Killion a demonstration ride in a 390 Mainship Trawler; and (5) that the Mainship dealership that purports to serve Massachusetts customers at present is DiMillo's, which is located in Maine.[7]

Mainship also submitted an affidavit of James Krueger, its Director of Marketing and Sales, who stated that Mainship has never conducted business in Massachusetts. According to Krueger, neither Scituate Yachts nor Russo Marine were dealers at the time Killion purchased the vessel, although each were at one time independent contractors for Mainship; he also stated that

---

[5] In response, Mainship submitted the affidavit of Hankins, who stated that corporate policy was not to send unsolicited promotional materials, but instead to send them only in response to a request by a potential customer. Hankins therefore asserts that it is "highly unlikely that unsolicited information would have been sent to Mr. Killion." Nevertheless, for purposes of the motion to dismiss, the Court credits Killion's assertion that he received a fax from Mainship in 1999; although Killion does not say one way or the other, the Court will assume that the fax was unsolicited.

[6] Mainship is owned by Luhrs. According to Killion, Russo Marine was also a dealer of Luhrs and Silverton boats, both manufactured by Luhrs, until 2003.

[7] Killion submitted a copy of several pages of the website for DiMillo's, which contain descriptions of certain Mainship vessels, including 390 Trawlers, and at least two other potentially relevant statements: (1) "DiMillo's Old Port Yacht Sales is proud to be the exclusive dealer of Mainship Trawlers & Pilot yachts for the Massachusetts, New Hampshire & Maine regions;" and (2) "Over the past several years, DiMillo's Old Port Yacht Sales has been a leading sales performer with Mainship Trawlers."

its dealership for the New England area at the time of the sale to Killion was located in Maine.[8]

## II.     Procedural Background

Killion commenced this action in Worcester Superior Court by filing a complaint against both defendants on October 5, 2004, alleging fraud, breach of contract, breach of warranty, and for violation of Mass. Gen. Laws chapter 93A.[9] Mainship answered the complaint in state court and then removed the case to this Court on December 13, 2004, on the basis of diversity jurisdiction. Killion amended his complaint on December 28, 2004. Commonwealth filed a motion to dismiss for lack of personal jurisdiction on January 19, 2005. On February 11, 2005, Killion filed an amended complaint, which Mainship answered on March 14, 2005. Mainship then moved the Court to dismiss the complaint for lack of personal jurisdiction, improper venue, and *forum non conveniens*, or, in the alternative, to transfer the case to the Eastern District of Virginia.

On August 25, 2005, the Court granted Commonwealth's motion to dismiss for lack of personal jurisdiction. The Court now turns to its analysis of the present motion.

## III.    Analysis

### A.     Timing of Motion to Dismiss

The first question to be addressed is whether the Court should consider the motion at all.

---

[8] Although Krueger does not say so explicitly, the Court assumes the Maine dealer is DiMillo's.

[9] The complaint alleges that, soon after acquiring the trawler, Killion began to observe problems with it, including a noticeable list and a loss of approximately three to four knots of top-end speed. Upon further investigation, Killion learned that the swim platform of the trawler had filled up with seawater, the added weight of which apparently caused the list and speed loss. Killion took the vessel to DiMillo's for repairs, where he learned that the swim platform was in fact cored and not made of solid fiberglass. In addition, the balsa-wood core of the swim platform had become permeated with seawater. According to Killion, if he had been aware that the vessel was not solid below the waterline or that the swim-platform leakage issues were present, he would not have purchased the vessel.

Under Fed. R. Civ. P. 12(b), a motion for lack of jurisdiction over the person and for improper venue should be made before the filing of an answer. 5C CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1361 (2005). Mainship argues that the Court should nonetheless consider and grant the motion. Killion has not opposed the motion on this basis, nor has he argued or attempted to make a showing that he has suffered any prejudice or hardship.

In any event, Mainship raised an affirmative defense of lack of personal jurisdiction in its answer. The Court notes that "federal courts have allowed untimely motions if the defense has been previously included in the answer." *Id.*; *see also Gerakaris v. Champagne*, 913 F. Supp. 646, 650-51 (D. Mass. 1996) (noting defendant's inclusion of the defense in his answer); *Stein v. Kent State Univ. Bd. of Trustees*, 994 F. Supp. 898, 901, (N.D. Ohio 1998), *aff'd* 181 F.3d 103 (6th Cir. 1999) (table decision). Given the posture of the case, the Court will treat the transgression as immaterial and consider the motion. *See also* Fed. R. Civ. P. 12(h)(1) (saving certain Rule 12(b) defenses from waiver). Alternatively, the Court will exercise its discretion to treat the motion as a preliminary hearing under Rule 12(d) and consider it on the merits. *See id.*

### B. Personal Jurisdiction

The Court next turns to the question of whether Killion has made a prima facie showing of *in personam* jurisdiction with respect to Mainship.

"To hear a case, this Court must have personal jurisdiction over the parties, 'that is, the power to require the parties to obey its decrees.'" *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 50 (1st Cir. 2002) (quoting *United States v. Swiss American Bank, Ltd.*, 191 F.3d 30, 35 (1st Cir. 1999)). "A district court, faced with a motion to

6

dismiss for lack of personal jurisdiction, Fed. R. Civ. P. 12(b)(2), 'may choose from among several methods for determining whether plaintiff has met [its] burden' of proving the court's personal jurisdiction over the defendant." *Northern Laminate Sales, Inc. v. Davis*, 403 F.3d 14, 22 (1st Cir. 2005) (quoting *Daynard*, 290 F.3d at 50-51).  The prima-facie method is the most common of these methods.  *Northern Laminate*, 403 F.3d at 22.  It "permits the district court 'to consider only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction.'" *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 145 (1st Cir. 1995) (quoting *Boit,* 967 F.2d at 675).  The prima-facie method is appropriate here because the jurisdictional ruling does not involve materially conflicting versions of the relevant facts.  *See Foster-Miller*, 46 F.3d at 145-46 (describing the preponderance-of-the-evidence and likelihood standards).

Under the prima-facie method, the Court "must accept the plaintiff's (properly documented) evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing." *Id.*  The plaintiff

> must do more than simply surmise the existence of a favorable factual scenario; he must verify the facts alleged through materials of evidentiary quality.  Thus, allegations in a lawyer's brief or legal memorandum are insufficient, even under the relatively relaxed prima facie standard, to establish jurisdictional facts.

*Barrett v. Lombardi*, 239 F.3d 23, 27 (1st Cir. 2001).  However, the Court is not required "to credit conclusory allegations or draw farfetched inferences." *Massachusetts School of Law*, 142 F.3d at 34 (quoting *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 203 (1st Cir. 1994)).  The Court must also accept as true the uncontradicted facts put forward by the defendant.  *Massachusetts School of Law*, 142 F.3d at 34.

The Court's personal jurisdiction over a defendant may derive from either general or specific jurisdiction. *Id.* "Specific jurisdiction exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities, such as when the litigation itself is founded directly on those activities." *Id.* In contrast, general jurisdiction will exist where the defendant "engaged in continuous and systematic activity, unrelated to the suit, in the forum state." *Id.*

Killion contends that both general and specific jurisdiction exist here. He bases that argument on the following contacts of Mainship with Massachusetts: (1) Mainship sent Killion an unsolicited fax in September 1999 with information on its Trawler; (2) Mainship and Commonwealth negotiated with Killion for the purchase of the vessel in Maryland but Commonwealth carried on further negotiations with him by phone and fax after he returned to Massachusetts; (3) Mainship had two, successive, authorized dealers located in Massachusetts for several years leading up to the time of his purchase[10] and its present dealership, located in Maine, is the exclusive dealership to serve Massachusetts customers; and (4) Commonwealth acted as Mainship's agent in its representations at the boat show.

To establish personal jurisdiction, Killion must show that the Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, § 3, grants jurisdiction, and that the exercise of jurisdiction is consistent with constitutional due process. *Daynard*, 290 F.3d at 52; *Boit*, 967 F.2d at 675; *Intech, Inc. v. Triple "C" Marine Salvage, Inc.*, 444 Mass. 122, 125 (2005). Killion does not

---

[10] Killion's affidavits do not support the proposition that Mainship had an authorized dealership in Massachusetts *at the time of the sale*; he states only that "in 2001 . . . Russo Yachts was selling a new Mainship vessel" and that "although the Russo Marine may or may not have lost the dealership in 2001, it continued to be a Luhrs and Silverton dealer until 2003." Krueger states unequivocally that neither Russo Marine nor Scituate Yachts were dealers at the time of the purchase, and Killion has not set forth evidence to contradict this.

cite a specific provision of the long-arm statute that he alleges is satisfied here.[11]  His failure to do so is not fatal; the Supreme Judicial Court has interpreted the long-arm statute as extending as broadly as to the limits of constitutional due process.  *Daynard*, 290 F.3d at 52; *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 770 (1994).  Therefore, the relevant inquiry is the constitutional one.

For a court to assert personal jurisdiction, the Due Process Clause of the Fourteenth Amendment requires that the defendant have a certain level of contacts with the forum such that the maintenance of the lawsuit does not offend traditional notions of fair play and substantial justice.  *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  Due process protects the liberty interest of the defendant in not being subject to the judgments of a forum with which he has not established "meaningful contacts, ties, or relations."  *Daynard*, 290 F.3d at 51 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985)).

### 1. **Specific Jurisdiction**

To establish specific jurisdiction, a plaintiff must show (1) relatedness, (2) purposeful availment ("minimum contacts"), and (3) reasonableness.  *Foster-Miller*, 46 F.3d at 144.  As to relatedness, "the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities."  *Id.*  As to purposeful availment, "the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the

---

[11] In his opposition to Commonwealth's motion to dismiss, Killion cited four subsections of the statute as potentially applicable to Commonwealth: § 3(*a*), which applies to any person "transacting business in" Massachusetts; § 3(*b*), which applies to any person "contracting to supply services or things in" Massachusetts; § 3(*c*), which applies to any person "causing tortious injury by an act or omission in" Massachusetts; and § 3(*d*), which applies to any person "causing tortious injury in [Massachusetts] by an act or omission outside [Massachusetts] if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in [Massachusetts]."  Killion argues that Commonwealth was an agent whose conduct is imputed to Mainship.  Therefore, the Court will consider whether the same provisions apply to the instant motion by virtue of such alleged agency relationship.

forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." *Id.* As to reasonableness, the exercise of jurisdiction must be said to be reasonable under the so-called "gestalt" factors. *Id.*

The Court turns first to the "relatedness" requirement. In support of his claim, Killion cites several contacts between Mainship and Massachusetts, only some of which are actually related to the litigation. For specific jurisdiction purposes, the Court must cull out those that are not; the focus must be on whether the litigation can be said to have directly arisen out of, or be directly related to, the forum-based contacts. For tort claims, the inquiry is whether the forum-based contacts are the legal cause, or proximate cause, of the tort. *Massachusetts School of Law*, 142 F.3d at 35. For contract claims, the inquiry is whether the forum-based activities are instrumental to the formation of the contract. *Id.*

The present case involves both types of claims (fraud, breach of contract, breach of warranty), as well as a chapter 93A claim. Killion bases these claims, quite clearly, on the conduct of Mainship and Commonwealth during, and after, the boat show. Therefore, at least three categories of forum-based activities are not related to the litigation.

The first is the unsolicited September 1999 fax from Mainship to Killion. Killion does not argue that his cause of action arose directly from, or is related directly to, that contact. Moreover, he neglects to provide any details of its contents. The fact that he received a fax does not, by itself, suggest that it affected his purchase decision or related to the alleged fraud by Commonwealth or Mainship. It would not be reasonable to infer that the unspecified contents of a fax from Mainship—that predates, by more than two years, the transaction at issue—directly gave rise to, or is directly related to, the litigation.

10

The second comprises the activities of the two authorized Mainship dealers that were located in Massachusetts around the times of the purchase of the vessel and the institution of this litigation. Killion argues that the Massachusetts dealers were "agents" of Mainship, and as such, their forum-based contacts should be imputed to Mainship. He does not, however, allege facts suggesting that his cause of action directly arose from, or is directly related to, any act or omission by either dealer.[12] He does not state that he visited or met with anyone from Scituate Yachts. Although he contends that Russo Marine gave him a "demo ride in a 390 Mainship," that ride was in the fall of 2000, and he does not allege that his dealings with Russo Marine directly gave rise to, or was directly related to, the contract with Mainship. Without any detail, the Court cannot assess whether it is reasonable to infer that his demonstration ride was "instrumental to the formation of the contract" with Commonwealth, or that it was the "cause in fact" and the "legal cause" of the tort aspect of his case. *See Massachusetts School of Law*, 142 F.3d at 35.[13]

The third involves the repair work on the subject boat. Killion states that the repairs were made by DiMillo's, which (he argues) is an "agent" of Mainship. It is true that DiMillo's, which is based in Maine, purports to cover the Massachusetts territory as a Mainship dealer (which, if a

---

[12] Because none of the dealers' activities appear to be related to the litigation, the Court need not take up the issue of agency until it reaches the question of general jurisdiction.

[13] The First Circuit addressed the question of relatedness in *Massachusetts School of Law*. In that case, the plaintiff law school sued the American Bar Association and other entities and individuals after its application for accreditation was rejected. The only activities undertaken in Massachusetts by certain individual defendant members of the ABA accreditation committee were a meeting in Boston and a retreat on Nantucket. At the Boston meeting, the defendant committee members decided to delay the site visit to the law school; this act affected plaintiff only in a "peripheral sense" and could not plausibly be said to have given rise to the plaintiff's myriad claims arising from the later decision against accreditation. 142 F.3d at 35. Nor did the Nantucket retreat represent a related contact because the committee "did not take up any agenda item concerning [the plaintiff law school's]" case for accreditation. *Id.* at 34-35. *See also Swiss American*, 274 F.3d at 621 (a defendant bank's business relationship with a Massachusetts resident was not itself a contact that was related to the United States's action to seize the resident's financial assets held by the defendant bank, even though such assets were the product of that business relationship).

forum-based contact at all, would be relevant only to general jurisdiction).[14] The repairs, however, occurred in Maine. That is not forum-based activity.

The question then becomes whether there are any remaining contacts between Mainship and Massachusetts that satisfy the "relatedness" test. Even taking a charitable view of the evidence, plainly there are not. Where Killion claims to have negotiated for the purchase of the vessel in Maryland with a Mainship representative, he also states that he did not make his purchase decision until he was back in Massachusetts (after negotiating further with a representative of Commonwealth). Mainship's meeting with a Massachusetts resident in Maryland is not a forum-based contact. And, outside of Mainship's possible agency relationship with Commonwealth, discussed below, there is nothing to suggest that Mainship knew that the vessel—which it manufactured in 2001 and 2002 in Florida—was bound for Massachusetts. Even if it did know this, such knowledge is not evidence that Mainship purposefully directed its business activities toward Massachusetts.

Killion further argues that the contacts of Commonwealth, some of which are plainly related to the litigation, can be imputed to Mainship. "For purposes of personal jurisdiction, the actions of an agent may be attributed to the principal." *Daynard*, 290 F.3d at 54, 57-60 (two groups of defendants led plaintiff and the public to believe they were in joint venture or other agency relationship with each another; contacts of one group of defendants to the forum state properly imputed to the other); *see also Donatelli v. National Hockey League*, 893 F.2d 459, 466

---

[14] The Court notes as well that the copy of DiMillo's website submitted by Killion includes apparent promotional material pertaining to Mainship trawlers. Plaintiff has not asserted that such statements in any way directly gave rise to or relate to the litigation. Nor would that be a reasonable inference as Killion does not allege that he viewed the website prior to the transaction at issue.

(1st Cir. 1990) (general rule is that jurisdiction over a partner confers jurisdiction over a partnership). To impute contacts of one entity to another, the court must assess "the nature of the legal and institutional relationships between them." *Donatelli*, 893 F.2d at 468. Specifically, the court must determine whether the "degree of control exercised" by one over the other was substantial, and whether one "can be said to act for and on behalf of the [other]." *Id.*

Here, Killion simply has not set forth sufficient facts that, taken as true, establish that Commonwealth is the agent of Mainship and that the former's forum-based contacts may be appropriately imputed to the latter. *See id.* (contacts of members of unincorporated association not imputed to association by sole virtue of membership, and the association did not "substantially influence[] the decisionmaking leading to the members' in-forum activities"). Killion thus cannot satisfy the "relatedness" requirement to establish personal jurisdiction over Mainship.

In short, even if the actions of Commonwealth were imputed to Mainship, they would be insufficient to establish specific personal jurisdiction. As described above, none of Mainship's direct contacts to Massachusetts can be said to be directly related to the litigation. As a result, the Court need not reach the issues of whether the "purposeful availment" requirement has been satisfied or asserting specific personal jurisdiction over Mainship would be reasonable.[15]

### 2. General jurisdiction

"General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic

---

[15] The Court has already held that Commonwealth's conduct was insufficient to establish the requisite "purposeful availment" by Commonwealth of the benefits of the forum to establish Commonwealth's own specific personal jurisdiction in Massachusetts. Even if Killion were able to satisfy the "relatedness" requirement, he would not be able to satisfy the "purposeful availment" requirement to the extent he relies on an agency relationship between Mainship and Commonwealth.

activity, unrelated to the suit, in the forum state." *Massachusetts School of Law*, 142 F.3d at 34; *accord Platten v. HG Bermuda Exempted Ltd.*, __ F.3d __, 2006 WL 268785 (1st Cir. Feb. 6, 2006). To establish general jurisdiction, the plaintiff must meet two criteria. "First, there must be 'continuous and systematic general business contacts' between the foreign defendant and the forum." *Swiss American*, 274 F.3d at 618 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 405, 416 (1984)). This test "is considerably more stringent than that applied to specific jurisdiction questions." *Swiss American*, 274 F.3d at 619 (citing *Noonan v. Winston Co.*, 135 F.3d 85, 93 (1st Cir. 1998)). In other words, the nature and extent of the contacts of defendant to the forum must strongly suggest, to a much greater extent than a minimal contacts showing for specific jurisdiction, that defendant has purposefully availed itself of the benefits of the forum. Second, plaintiff must show that the "exercise of jurisdiction would be reasonable" in light of the so-called "gestalt" factors. *Swiss American*, 274 F.3d at 619.

Killion appears to assert some form of a "stream of commerce" theory—that because Mainship placed its vessel into the stream of interstate commerce, knowing that it would end up in Massachusetts, it undertook action that was purposefully directed at Massachusetts.[16] The First Circuit, however, has rejected that theory. *Rodriguez v. Fullerton Tires Corp.*, 115 F.3d 81, 85 (1st Cir. 1997) (citing *Asahi Metal Indus. Co. v. Superior Ct.*, 480, U.S. 102 (1987)).

In any event, there is no evidence in the record that the Mainship representative at the boat

---

[16] Without further explanation, Killion argues in his brief that Mainship created "*materials*" on which Killion relied, and placed such materials into "the stream of commerce." It is unclear what he means by this. The only *information* that Killion alleges to have relied on in purchasing the vessel are the statements of Mainship and Commonwealth representatives at the boat show (although even this averment is not supported by the evidence). He identifies an unsolicited fax that he received in September 1999 about the trawler, but he has not supplied a copy of the fax to the Court, and he does not allege that he relied on information contained in it. The fax predates his purchase decision by over two years, and, without, at a minimum, a description of the content of the fax, the Court will not draw the inference that Killion relied on it.

show knew that Killion was from Massachusetts, and that he intended to take the vessel to Massachusetts. And even if Mainship did know it, it is highly doubtful that such knowledge would be sufficient to establish general jurisdiction. *See, e.g.*, *Rodriguez*, 115 F.3d at 85 (knowledge that California distributor would move manufacture's tire rims into Puerto Rico); *Boit*, 967 F.2d at 682 (knowledge that national retailer could resell manufacture's hot air gun in Maine through catalog).

The other forum-based contacts, whether considered individually or in the aggregate, do not show systematic or continuous contacts with Massachusetts. The "dealership" relationships that Mainship had with companies in Massachusetts and Maine do not, standing alone, qualify as such contacts. As stated above, Killion argues that the Massachusetts and Maine-based dealers are agents of Mainship and that their contacts should be imputed to it. Killion's "agency" description is conclusory; he has not come forward with facts to suggest the type of control and influence required to impute the contacts of the "agents" to the alleged principal. *See Donatelli*, 893 F.2d at 468. Moreover, Killion has done nothing to refute Hankins's assertion that the dealers were merely "independent contractors," not subject to the control of Mainship.

The fact of a dealership arrangement with a company in the forum state is not enough to establish even minimum contact to the forum. *U.S.S. Yachts, Inc. v. Ocean Yachts, Inc.*, 894 F.2d 9, 12-13 (1st Cir. 1990) (dealership agreement between plaintiff and defendant that was extended to cover and establish exclusive marketing outlet for defendant's yachts in Puerto Rico through plaintiff, and plaintiff acted to establish Puerto Rican operations, was not sufficient connection to Puerto Rico to establish minimum contacts). At a bare minimum, information about the nature and scope of the dealership operations and the arrangement between the manufacturer and its

dealer is necessary to be able to determine whether the manufacturer purposefully availed itself of the benefits of the state that the dealer covers or in which it operates. Accordingly, the fact that Mainship had authorized dealers in Massachusetts that probably made some sales does not establish the systematic and continuous business contacts necessary to justify general jurisdiction. *See Salgado-Santiago v. American Baler Co.*, 394 F. Supp. 2d 394 (D.P.R. 2005) (fact that seller of allegedly defective product, located in Puerto Rico, had been an authorized dealer for forty years for the manufacture of such product, along with other evidence, was not sufficient evidence of continuous contacts by manufacturer with Puerto Rico).

Here, there is no evidence as to any dealership agreement, nor is there any other evidence concerning Mainship's contact with the dealers. There is no information, for example, as to whether Massachusetts law governed the parties' relationships; the extent of the dealers' marketing efforts of Mainship vessels; the volume and value of sales in Massachusetts or sales quotas; or whether the manufacturer supported the dealer by sending its employees to the dealer for training or otherwise. While it may be a reasonable inference that Scituate Yachts or Russo Marine made at least *some* sales of Mainship vessels during the time period, it would be speculative to make any assumptions about the timing, frequency, and value of such sales to Mainship.[17] The demonstration ride does not add much to the analysis; at most, it establishes that one Mainship vessel was present at the dealership. Whether this was a part of Russo's inventory,

---

[17] For the same reason, the mere fact that Russo Marine continued to be a dealer of Luhrs boats until 2003 does not constitute systematic or continuous contact between Mainship and Massachusetts. Even if extensive sales of Luhrs boats or other contacts of Luhrs to Massachusetts were shown, Killion has not set forth sufficient facts to show that the stringent test for disregard of the corporate form has been met. *See, e.g.*, *Noonan.*, 135 F.3d at 94 (veil piercing between entities in same corporate family inappropriate where allegation was based on nothing more than existence of such relationship and fact that both entities sold same product).

and the value of that inventory, is again left to speculation.

Furthermore, the Massachusetts dealerships were apparently of short duration, and no longer existed at the time of Killion's purchase. This suggests, if anything, that the benefits to Mainship of those dealerships was not great. Even if a Maine-based dealer's sales could be said to be a Massachusetts contact—a doubtful starting point—the statements on DiMillo's website, such as its claim to be a "leading sales performer with Mainship Trawlers" are too generalized to conclude the nature and extent of sales, if any, to Massachusetts customers. *Cf. Howse v. Zimmer Mfg. Co.*, 757 F.2d 448, 452-53 (1st Cir. 1985) (manufacturer of surgical implant devices subject to personal jurisdiction in Massachusetts based on the facts that (1) the defendant manufacturer had a Massachusetts distributor—an independent contractor—with a year's sales of $4 million and the maintenance of $380,000 or more of inventory of the manufacturer's products; and (2) the manufacturer's own employees "always" traveled to Massachusetts to confer with prospective and actual customers concerning the development of new products).

In summary, the Court concludes that Mainship did not engage in continuous and systematic business contacts with Massachusetts, and therefore the exercise of personal jurisdiction against Mainship would offend traditional notions of "fair play and substantial justice." *See Foster-Miller*, 46 F.3d at 150; *International Shoe*, 326 U.S. at 316 . The Court need not assess whether the exercise of general jurisdiction would be reasonable in light of the so-called "gestalt" factors, and need not reach Mainship's arguments for dismissal on the grounds of improper venue and *forum non conveniens*.

### IV.    Conclusion

For the foregoing reasons, Defendant's motion to dismiss pursuant to Fed. R. Civ. P.

12(b)(2) is GRANTED.

**So Ordered.**

                                                   /s/ F. Dennis Saylor  
                                                   F. Dennis Saylor IV  
                                                   United States District Judge

Dated: February 16, 2006